NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

AIR EXPRESS INTERNATIONAL, d/b/a
DHL GLOBAL FORWARDING
CORPORATION,

                 Plaintiff,

                 v.

LOG-NET, INC.,

                 Defendant.

Civil Action No. 12-1732 (MAS) (TJB)

**MEMORANDUM OPINION**

## SHIPP, District Judge

This matter comes before the Court upon Plaintiff Air Express International d/b/a DHL Global Forwarding Corporation's ("DHL") omnibus motion[1] (ECF No. 297) and Defendant LOG-NET, Inc.'s ("LOG-NET") Motion for Attorneys' Fees and Costs (ECF No. 298), Motion for Release of Bond Obligation (ECF No. 300), Motion for Permanent Injunction (ECF No. 301), and Motion for Prejudgment Interest (ECF No. 302). LOG-NET opposed DHL's motion (ECF No. 310), and DHL replied (ECF No. 317). DHL opposed LOG-NET's motions (ECF Nos. 306, 307, 308, 309), and LOG-NET replied (ECF Nos. 318, 319, 320, 321). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons stated below, and for other good cause shown, DHL's omnibus motion is denied; LOG-NET's Motions for Attorneys' Fees and Costs, Release of Bond

---

[1] DHL moves for (1) Judgment as a Matter of Law, and (2) a New Trial, or, in the alternative, remittitur.

Obligation, and Permanent Injunction are denied; and LOG-NET's Motion for Prejudgment Interest is granted.

## I.  <u>Background</u>[2]

On July 9, 2018, a jury trial commenced on DHL's three claims against LOG-NET and LOG-NET's eleven counterclaims against DHL.  The jury received stipulated facts, deposition testimony (video testimony was shown to the jury and certain portions of other depositions were read into the record), and live testimony from numerous witnesses.  On July 20, 2018, the jury returned a verdict for LOG-NET on (1) all of DHL's claims against LOG-NET, and (2) two of LOG-NET's counterclaims against DHL.  (Verdict Sheet, ECF No. 284.)  Specifically, the jury found for LOG-NET on Count 3—Breach of the Covenant of Good Faith and Fair Dealing, and Count 4—Copyright Infringement.  (*Id.*)  The jury awarded LOG-NET $14,261,000 for Count 3 and $150,000 for Count 4, totaling $14,411,000 in damages.[3]

On August 17, 2018, pursuant to Federal Rule of Civil Procedure 59,[4] DHL moved for a new trial, or in the alternative, for remittitur on Count 3.  (DHL's Moving Br. 2, ECF No. 297.)  In the same motion, DHL also moved pursuant to Rule 50(b) for a judgment as a matter of law on Count 4.  (*Id.*)  On the same day, LOG-NET moved for attorneys' fees and costs on Count 3 pursuant to 17 U.S.C. § 505.  (LOG-NET's Moving Br. 1 ("Fees Br."), ECF No. 298-1.)

---

[2] As the parties are familiar with the factual and procedural background of this matter, the Court omits most of the lengthy history of this nearly seven-year old case.

[3] The verdict sheet did not require the jury to separate the damages award by count.  (*See* Verdict Sheet 4.)  The jury, nonetheless, responded to Question 10 of the Verdict Sheet as follows: "$14,261,000 + $150,000 = $14,411,000." (*Id.*)  When the Court questioned the Jury Foreperson regarding the verdict, the Foreperson stated that the jury awarded $14,261,100 for Count 3 and had separated the damage awards in its response to Question 10.  (*See* Trial Tr. 1743:17-1744:19.)

[4] All references to a Rule herein are references to the Federal Rules of Civil Procedure.

LOG-NET also moved for a permanent injunction pursuant to 17 U.S.C. § 502(a). (LOG-NET's Moving Br. 3 ("Injunction Br."), ECF No. 301-1.) Pursuant to Rule 65(c), LOG-NET moved for release of the $1,000,000 injunction bond to LOG-NET as a "wrongfully enjoined" party. (LOG-NET's Moving Br. 1 ("Bond Br."), ECF No. 300-1.) LOG-NET moved for prejudgment interest on the jury award for Count 3. (LOG-NET's Moving Br. ("Interest Br."), ECF No. 302-1.) The Court addresses DHL's motions first, and then addresses LOG-NET's motions.

## II.    Discussion

### A.    DHL's Motion for a New Trial is Denied

Rule 59(a)(1)(A) provides that a court may award a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" The purpose of a motion pursuant to Rule 59 is "to correct manifest errors of law or fact or to present newly discovered evidence." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010) (quoting *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)). Courts have the discretion to grant a new trial on several grounds, including: "(1) that the verdict is against the weight of the evidence; (2) that the damages are excessive; or (3) that the district court made substantial errors in the admission or rejection of evidence or in its instructions to the jury." *Winnicki v. Bennigan's*, No. 01-3357, 2006 WL 2506738, at *1 (D.N.J. Aug. 28, 2006) (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).

"[A] new trial should be granted only when the verdict is contrary to the weight of the evidence or when a miscarriage of justice would result if the verdict were to stand." *Brennan v. Norton*, 350 F.3d 399, 430 (3d Cir. 2003). A district court may not "grant a new trial because it would have come to a different conclusion than that reached by the jury." *Lyles v. Flagship Resort Dev. Corp.*, 371 F. Supp. 2d 597, 602 (D.N.J. 2005). Therefore, "[i]n determining whether the

evidence is sufficient the court is not free to weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury." *Lightning Lube, Inc. v. Witco Corp.*, 802 F. Supp. 1180, 1185 (D.N.J. 1992), *aff'd*, 4 F.3d 1153 (3d Cir. 1993). "The motion may be granted if 'the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.'" *Lyles*, 371 F. Supp. 2d at 600 (quoting *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 166 F. Supp. 2d 19, 28 (D.N.J. 2001)).

"When a defendant claims that a jury's award of damages is excessive, '[a] new trial is warranted only where the verdict is grossly excessive and bears no rational connection to the evidence.'" *Lyles*, 371 F. Supp. 2d at 604 (alterations in original) (quoting *Blakey v. Cont'l Airlines Inc.*, 992 F. Supp. 731, 734 (D.N.J. 1998)).

> For the court to disturb a jury verdict, the damages assessed by the jury must be so unreasonable as to offend the conscience of the Court. If the trial court finds that the verdict is a result of passion or prejudice by the jury, the court must grant a new trial. The court's obligation, however, is to uphold the jury's award if there exists a reasonable basis to do so.

*Id.* (quotations and citations omitted).

### 1. The Parties' Arguments

DHL argues that the verdict on Count 3 was against the weight of the evidence and "cries out to be overturned." (DHL's Moving Br. 14.) DHL states that "federal and state courts in New Jersey have repeatedly held that damages arising out of a claim for breach of the implied covenant of good faith and fair dealing must be both causally related to the alleged acts, and above and beyond those damages contemplated by the contract." (*Id.* at 14-15.) DHL insists that "three of Count 3's four allegations (reverse engineering, copying portions of LOG-NET's database into ISC+ without paying licensing fees, and unpaid subscription fees for allegedly undisclosed servers) are covered by . . . the 2008 License Agreement, and are thus encompassed by the breach of

contract allegations of Count 1." (*Id.* at 15.) DHL argues that the "jury misread or misunderstood the jury instructions related to LOG-NET's allegations under Count 3" because LOG-NET Trial Exhibit 216 reflected "unpaid *license* fees in the amount of $13,759,702.60, and unpaid *subscription* fees in the amount of $585,674.20[,]" and the "server-related non-payment allegation of Count 3 speaks only to unpaid *subscription* fees." (*Id.* at 17 (emphasis in original).) DHL states that,

> The only allegation of Count 3 that does not overlap with Count 1 is the allegation that DHL breached the covenant of good faith and fair dealing by seeking an injunction based, in part, on DHL's assertion that absent the injunction LOG-NET would refuse to provide DHL with the necessary pre-paid technical support it needed, and the lack of support would bring DHL's business to a halt.

(*Id.* (quotations and citations omitted).) DHL argues that this allegation is based on the Certification of Corey Bertsch and that certification was based on the 2008 Support Agreement, not the 2008 License Agreement, which was the only agreement at issue in DHL's preliminary injunction application. (*Id.* at 17-18.)

DHL argues that the jury's award on Count 3 was grossly excessive for several reasons. (*Id.* at 19.) First, DHL argues that "any damages awarded for Count 3 cannot consist of breach of contract damages already subsumed by the allegations of Count 1 . . . [because] [o]therwise, the damages award would be grossly excessive and punitive in nature, as it can only reflect anger at DHL, which violates the jury's responsibilities to decide the case without passion or prejudice." (*Id.* at 20.) DHL again argues that no damages could have been awarded on the reverse engineering, ISC+ copying, or subscription fees allegations of Count 3 because the jury found for DHL on those issues in Count 1. (*Id.*) Turning to Mr. Bertsch's certification, DHL argues that LOG-NET offered no evidence establishing the "quantum of damages it allegedly suffered by reason of Mr. Bertsch's mistake." (*Id.* at 21.) DHL avers that when the "fair market value damages of $34.7 million," as proffered by Terence Griswold, LOG-NET's damages expert, is divided by

LOG-NET's 11 counterclaims, the result is "\$3.1 million per counterclaim, or 22% of the verdict on Count 3." (*Id.* at 21-22.)

LOG-NET opposes DHL's motion for a new trial arguing that the "liability finding on [Count 3], and the corresponding damage award, is consistent with the evidence and the expert testimony provided by LOG-NET at trial." (LOG-NET's Opp'n Br. 12, ECF No. 310.) LOG-NET argues that the jury instructions on Count 3 "did not constitute an exclusive list of DHL's allegedly wrongful conduct," instead, the instructions "set out the allegations as . . . .'among other things.'" (*Id.* at 12-13 (quoting Jury Instrs. ¶ 72, ECF No. 274).) LOG-NET further argues that "a finding of liability for breach of the covenant of good faith and fair dealing . . . is . . . not contingent upon the jury finding that express provisions of the contract were also breached." (*Id.* (citing *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387 (N.J. 2005); *Bak–A– Lum Corp. of Am. v. Alcoa Bldg. Prods., Inc.*, 351 A.2d 349 (N.J. 1976); *Kurnik v. Cooper Health Sys.*, No. A-4686-06, 2008 WL 2829963 (N.J. Super. Ct. App. Div. July 24, 2008)).) LOG-NET argues that the testimony of Corey Bertsch, James Bocchino, Brice Jones, and Patrick Hoey was sufficient for the jury to conclude that DHL's action "violated ethical business norms and constituted a breach of the covenant of good faith and fair dealing and resulted in damage to LOG-NET." (*Id.* at 15-17.)

LOG-NET also argues that DHL's arguments are "a disguised appeal of the jury instructions on the elements of breach, the potential instances of the breach, and the recoverable damages." (*Id.* at 19.) LOG-NET insists that DHL's arguments regarding three of the four allegations of Count 3 being encompassed by the breach of contract claim "ignor[es] the fact that those four examples were preceded by language stating that 'DHL breached the implied covenant of good faith and fair dealing by *among other things* . . . .'" (*Id.* at 19 n.8. (citations and quotations

omitted).) Thus, per LOG-NET, the record was "replete with examples of DHL's bad faith conduct in violation of the implied covenant of good faith and fair dealing, beyond just that which was set forth as examples in the jury instructions. (*Id.*)

Here, the Court finds that DHL is not entitled to a new trial because the jury verdict on Count 3 was not against the weight of the evidence and the amount awarded was not excessive. DHL's arguments to the contrary are unpersuasive because they are premised on a misinterpretation of New Jersey law and a selective reading of the jury instructions. The Court addresses each of these issues in turn.

### 2. DHL Misinterprets New Jersey Law

New Jersey common law provides that "[a] covenant of good faith and fair dealing is implied in every contract in New Jersey." *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126 (N.J. 2001). "Although the implied covenant of good faith and fair dealing cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term." *Id.* The New Jersey Supreme Court has stated that it "cannot catalogue the myriad forms of conduct that may constitute a violation of the covenant of good faith and fair dealing." *Brunswick Hills Racquet Club, Inc.*, 864 A.2d at 396. Instead, "[e]ach case is fact-sensitive." *Id.* "A plaintiff may be entitled to relief under the covenant if its reasonable expectations are destroyed when a defendant acts with ill motives and without any legitimate purpose." *Id.*

DHL asserts "that damages arising out of a claim for breach of the implied covenant of good faith and fair dealing must be both causally related to the alleged acts, and above and beyond those damages contemplated by the contract[.]" (DHL's Moving Br. 14-15; *see also* DHL's Reply Br. 6, ECF No. 317 (stating that New Jersey law requires a party raising a breach of the implied

covenant of good faith and fair dealing claim to "prove damages above and beyond those damages available for breach of the express provisions of the underlying contract.").) DHL cites to *Aequus Techs., LLC. v. gh, LLC.*, No. 03-5139, 2011 WL 1211328, at *4 (D.N.J. Mar. 29, 2011), which cites to *Kassa v. Johnson*, No. A-3345-07, 2009 WL 1658528, at *5 (N.J. Super. Ct. App. Div. June 16, 2009), in support of this proposition. (DHL's Moving Br. 15.)

In *Kassa*, the New Jersey Superior Court, Appellate Division, wrote that it was "preserv[ing the] plaintiffs' contractual claim for breach of the duty of good faith and fair dealing, to the extent that claim encompasses acts and damages beyond those sought for breach of contract." *Kassa*, 2009 WL 1658528, at *5. The Appellate Division made this statement in a summary of its disposition of the plaintiffs' appeal of the Superior Court's dismissal of several of the plaintiffs' claims. *Id.* The *Kassa* Court was not addressing the appropriate measure of damages for a breach of the covenant of good faith and fair dealing claim vis-à-vis damages for a breach of contract claim. Moreover, the *Kassa* Court simply articulated the proposition that a plaintiff cannot seek duplicative recovery for a breach of contract claim and a breach of the covenant of good faith and fair dealing claim when both claims are based on the same conduct. *Id.*; *see Cedar Holdings, LLC v. Menashe*, No. 16-7152, 2017 WL 1349321, at *3 (D.N.J. Apr. 7, 2017) (stating "a plaintiff may not pursue a claim for a breach of the implied covenant of good faith and fair dealing if the claim is duplicative of the plaintiff's breach of contract claim. A claim for breach of the implied covenant is duplicative of a breach of contract claim when allegations of bad faith all relate to actions that form the basis of the breach of contract claim.") (citations omitted). Simply put, the *Kassa* Court's statement, as quoted by DHL, is best understood as declaring that the *Kassa* plaintiffs' breach of the covenant of good faith and fair dealing claim could survive so long as it was distinguishable from the plaintiffs' breach of contract claim, which also survived the *Kassa* Court's review.

The logical extension of DHL's interpretation of the New Jersey Superior Court, Appellate Division's statement in *Kassa* is that a plaintiff cannot seek, or be awarded, the same damages for a breach of the covenant of good faith and fair dealing claim as it could for a breach of contract claim. Indeed, DHL argues that, "under New Jersey law, a party cannot use the implied covenant to impose liability for acts covered by express contract terms, or *to recover ordinary breach of contract damages*." (DHL's Moving Br. 6 (emphasis added).) The second clause of this statement is contrary to New Jersey case law, which holds that a plaintiff may recover damages traditionally available for a breach of contract claim when the plaintiff is successful on a breach of the covenant of good faith and fair dealing claim. *See, e.g.*, *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 590 (N.J. 1997) (upholding the jury's award of lost profits as damages for the breach of the covenant of good faith and fair dealing); *Wade v. Kessler Inst.*, 778 A.2d 580, 590 (N.J. Super. Ct. App. Div. 2001), *aff'd as modified*, 798 A.2d 1251 (N.J. 2002) ("Thus, once the jury determined [the] defendant breached the implied covenant of good faith and fair dealing, and that breach proximately caused [the] plaintiff monetary damages, [the] defendant was liable to [the] plaintiff for her reasonable losses arising from that breach."). Accordingly, DHL's position that LOG-NET was required to proffer "record evidence of any damages . . . suffered by LOG-NET that . . . differ in . . . material respect[s] from the sort of 'benefit of the bargain' damages arising from a breach of one or more express provisions of the 2008 License Agreement[,]" is contrary to New Jersey law and unpersuasive. (DHL's Reply Br. 8.)

### 3.    DHL Misreads the Jury Instructions on Count 3

DHL's arguments regarding the jury instructions for Count 3 and how those instructions encompassed portions of Count 4 fail because they ignore the full context of the instructions. After several rounds of revisions involving the parties and the Court, the parties submitted jointly

proposed jury instructions. (July 19, 2018 Tr., 1564:12-20, ECF No. 325.) For Count 3, the jury

instructions stated that "there are many forms of conduct that might constitute a violation of the

implied covenant of good faith and fair dealing, but *each case is fact sensitive*."[5] (Jury Instrs. ¶ 71,

ECF No. 274 (emphasis added).) The instructions first summarized the contours of a breach of

the covenant of good faith and fair dealing claim:

> In order for you to find that there has been a breach of the implied covenant of good
> faith and fair dealing in this case, LOG-NET must prove to you that DHL, with no
> legitimate purpose: (l) acted with bad motives or intentions or engaged in deception
> or evasion in the performance of contract; and (2) by such conduct, denied
> LOG-NET of the bargain initially intended by the parties.

(*Id.*) Next, the instructions summarized LOG-NET's factual claims on Count 3:

> LOG-NET in this case claims that DHL breached the implied covenant of good
> faith and fair dealing by *among other things*: failing to pay LOG-NET additional
> subscription fees for the use of its software and computer system on undisclosed
> servers, copying LOG-NET's database structure, tables and table names directly in
> to the ISC plus application to achieve the same level of capability as LOG-NET
> without authorization or payment for licensing fees, and by reverse engineering
> LOG-NET's software and other aspects of its computer system. LOG-NET also
> claims that DHL breached the covenant of good faith and fair dealing by seeking
> an injunction based, in part, on DHL's assertion that absent the injunction
> LOG-NET would refuse to provide DHL with the necessary pre-paid technical
> support it needed, and the lack of support would bring DHL's business to a halt.

(*Id.* ¶ 72 (emphasis added).) The instructions included DHL's denials and then identified the

elements LOG-NET had to prove for the jury to return a verdict in LOG-NET's favor on Count 3:

> To prevail on this claim, LOG-NET must prove each of the following three
> elements by a preponderance of the evidence: First, LOG-NET must prove that
> some type of contract existed between the parties. There can be no breach of the
> covenant of good faith and fair dealing unless the parties have a contract. Here, the
> parties agree a contract existed. Second, LOG-NET must prove that DHL acted
> with no legitimate purpose and in bad faith with the purpose of depriving
> LOG-NET of rights or benefits under the contract. Third, LOG-NET must prove
> that DHL's conduct caused LOG-NET to suffer injury, damage, loss or harm.

---

[5] The Court refers to the written jury instructions for the parties' convenience. The Court delivered
the instructions as written to the jury. (*Compare* Jury Instrs. *with* July 20, 2018 Tr.
1589:23-1648:10.)

(*Id.* ¶¶ 74-77.) The Court delivered the final instructions to the jury as proposed by the parties. (July 20, 2018 Tr. 1612:18-1619:7.)

In reply, DHL emphasizes its disagreement with LOG-NET's assertion that the use of "among other things" indicates that the factual allegations "were only offered by way of example." (DHL's Reply Br. 8.) DHL's position, however, ignores the context in which the factual allegations were provided. The factual allegations were preceded by a basic summary of a breach of the covenant of good faith and fair dealing claim and followed by the specific elements of the same. The jury was not charged with determining whether DHL breached the covenant of good faith and fair dealing by violating express terms of the contract. Instead, the jury was charged with determining whether "DHL acted with no legitimate purpose and in bad faith with the purpose of depriving LOG-NET of rights or benefits under the contract" and whether "DHL's conduct caused LOG-NET to suffer injury, damage, loss or harm." (Jury Instrs. ¶¶ 74-77.)

Comparing the structure of Count 3 against Count 1 further confirms that liability on Count 3 is not limited to the factual allegations provided in Count 3, as DHL insists. In Count 1, the factual allegations are preceded by the introductory clause, "LOG-NET claims that DHL breached the contract in the following manner," followed by allegations of DHL's breach of specific sections of the contract. (*Id.* ¶ 57 (referencing Sections 2, 3, 8, 9, 12, and 38).) Count 3, in contrast, does not reference specific sections of the contract. In the instructions for Count 3, the factual allegations portion of the instructions was preceded by guidance that "there are many forms of conduct that might constitute a violation of the implied covenant of good faith and fair dealing," and that "each case is fact-sensitive." (*Id.* ¶ 71.) By prefacing the list of factual allegations with the phrase "among other things," the jury instructions signaled to the jury that what followed was

a non-exclusive list of DHL's alleged conduct, which the jury could consider, but was not limited to, when determining whether DHL's conduct violated the covenant of good faith and fair dealing.

Finally, contrary to DHL's assertion that LOG-NET was required to prove damages other than contract damages, the jury instructions, in accordance with New Jersey law, were not so limiting. Instead, the jury was instructed that it could "award LOG-NET the amount of compensatory damages [it] deem[ed] reasonable considering all the evidence presented." (*Id.* ¶ 88.) The jury instructions limited the damages that could be awarded to those damages that (1) LOG-NET demonstrated by a preponderance of the evidence and (2) could be "quantified with a reasonable degree of precision." (*Id.* ¶ 89.)

### 4. The Jury had a Reasonable Basis to Reach its Verdict

Given that the jury was *not* restricted to only the examples in Count 3, the jury was free to consider all of DHL's conduct when determining DHL's liability on Count 3. The Court agrees with LOG-NET that "there was more than sufficient evidence from which the jury could, and did, conclude that DHL breached the covenant of good faith and fair dealing." (LOG-NET's Opp'n Br. 14.) The testimony of James Bocchino, Irene Costa, Brice Jones, Corey Bertsch, John Motley, and others, along with the documentary evidence introduced at trial were sufficient for the jury to conclude that DHL "engaged in some conduct that denied [LOG-NET] the benefit of the bargain originally intended by [DHL and LOG-NET]." *China Falcon Flying Ltd. v. Dassault Falcon Jet Corp.*, 329 F. Supp. 3d 56, 74 (D.N.J. 2018). Given the testimony of LOG-NET's damages expert, who estimated damages to LOG-NET from DHL's conduct to be "approximately $34 million[,]" and LOG-NET Trial Exhibit 216, showing that DHL owed LOG-NET over $14 million related to undisclosed servers running LOG-NET's software, the Court concludes that there is a "reasonable

basis" to uphold the jury's verdict. *Lyles*, 371 F. Supp. 2d at 604. For the same reasons just discussed, the Court denies DHL's Motion for Remittitur.[6]

### B. DHL's Motion for Judgment as a Matter of Law is Denied

Rule 50(a)(2) provides that a party may move for a judgment as a matter of law ("JMOL") "at any time before the case is submitted to the jury." Rule 50(b) provides that if the Court does not grant a motion for JMOL pursuant to Rule 50(a), the moving party may file a renewed motion within 28 days after the jury is discharged. JMOL is appropriate when the Court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party on that issue." Fed. R. Civ. P. 50(a). When the Court does not a grant a party's motion for JMOL, as occurred here, the Court is "considered to have submitted the action to the jury subject to the [C]ourt's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b).

"To prevail on a renewed motion for JMOL under Rule 50(b) following a jury trial and verdict, the moving party 'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied by the jury's verdict cannot in law be supported by those findings.'" *In re Biogen '755 Patent Litig.*, 335 F. Supp. 3d 688, 699 (D.N.J. 2018) (quoting *Power Integrations, Inc. v. Fairchild Semiconductor*

---

[6] "A remittitur is in order when a trial judge concludes that a jury verdict is 'clearly unsupported' by the evidence and exceeds the amount needed to make [a party] whole." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100 (3d Cir. 1995) (citation omitted). Typically, a jury verdict is "clearly unsupported" by evidence given at trial when there is no "rational relationship between the specific injury sustained and the amount awarded." *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 773 (3d Cir. 1987); *see also Cortez v. Trans Union, LLC*, 617 F.3d 688, 716 (3d Cir. 2010). The Court "may not . . . reduce [an] award merely because it would have granted a lesser amount of damages" and must uphold an award if there is any "reasonable basis to do so." *Braden v. Lockheed Martin Corp.*, No. 14-4215, 2017 WL 6447867, at *17 (D.N.J. Dec. 18, 2017) (quoting *Blakey*, 992 F. Supp. at 734). DHL's arguments in support of remittitur significantly overlap with its arguments in support of its motion for a new trial. (*Compare* DHL's Moving Br. 13-22 *with* DHL's Moving Br. 23-25.) Because the Court concludes there is a reasonable basis for the jury's verdict and award, DHL is not entitled to remittitur.

*Int'l, Inc.*, 843 F.3d 1315, 1326 (Fed. Cir. 2016)). The Court must "view[] the evidence in the light most favorable to the nonmovant and giv[e] it the advantage of every fair and reasonable inference[.]" *Lightning Lube, Inc.*, 4 F.3d at 1166. The Court does not "weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *Id.* The Court's inquiry is "whether there is evidence upon which the jury could properly find a verdict for that party." *Id.* A mere "scintilla of evidence is not enough to sustain a verdict of liability." *Id.* A JMOL may be granted if "the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015).

### 1.     The Parties' Arguments

DHL moved for a JMOL on Count 4 at the close of LOG-NET's case-in-chief and timely renewed its motion after the jury returned a verdict in LOG-NET's favor. During oral argument on the motion, DHL argued that Count 4 should be dismissed because LOG-NET failed to present any evidence of the materials that were subject to copyright or any evidence regarding infringement of those copyrights. (July 18, 2018 Tr. 1358:2-18.) The Court reserved on DHL's motion. (July 18, 2018 Tr. 1367:6-7.) DHL's renewed motion makes the same arguments that DHL made during the trial. (DHL's Moving Br. 26-27.) Specifically, DHL argues that LOG-NET "failed to offer any evidence at trial as to the content of its copyrights[,]" thus, "any determination by the jury that DHL infringed on LOG-NET's copyrights by copying anything in particular (such as the table names and column headings used on DHL's ISC+ application) has no evidentiary basis and cannot stand." (*Id.* at 27.)

LOG-NET opposes DHL's motion and summarizes the dispute as being over "the manner by which the elements of copyright infringement may be proven." (LOG-NET's Opp'n Br. 22.)

LOG-NET insists that it "only needed to establish '(1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work.'" (*Id.* at 25 (quoting *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002)).) LOG-NET insists that the dispositive question is "what relevant evidence did LOG-NET produce in support of these two elements?" (*Id.* at 25-26.) To answer this question, LOG-NET highlights the introduction of documentary evidence, DTE 330, and John Motley's testimony regarding the same. (*Id.* at 26.) DTE 330 is a chart of LOG-NET's copyright registrations and Mr. Motley provided "testimony on what was covered by the registrations." (*Id.*) LOG-NET argues that this evidence was sufficient to trigger a rebuttable presumption that LOG-NET possessed valid copyrights, and DHL failed to rebut this presumption. (*Id.*) LOG-NET avers that if DHL's trial strategy was to raise the issue of whether "the tables copied from LOG-NET's database to run ISC+ were a sufficient copying to constitute infringement in hopes of persuading the jury that LOG-NET failed to show a 'real' copying, the jury's verdict is conclusive evidence that DHL failed . . . to carry its factual burden." (*Id.* at 27.)

DHL's Reply Brief brings DHL's argument into sharper focus. DHL insists that "LOG-NET never produced the redacted source code submitted to the Copyright Office to obtain its copyright registrations, and thus never showed what information LOG-NET wanted to copyright." (DHL's Reply Br. 12-13.) DHL insists that the following facts are undisputed: (1) LOG-NET was required to submit redacted source code to the Copyright Office and this redacted source code "is the registered work for purposes of copyright protection"; (2) the redacted source code was not offered into evidence during the trial; and (3) LOG-NET failed to "demonstrat[e] that the ISC+ database headings showing in LOG-NET Trial Exhibit 65 were part of the redacted source code submitted to the Copyright Office, or that these headings are covered

by any of the copyrights listed in [DTE 330]." (*Id.* at 13.) Per DHL, the failure to introduce the source code results in the absence of a "rational way for the jury to determine if there was substantial similarity between any copyrightable LOG-NET information, and any accused information in either ISC+ or the GT Nexus database." (*Id.* (citing *Antonick v. Elec. Arts, Inc.*, 841 F.3d 1062, 1066 (9th Cir. 2016); *Airframe Sys., Inc. v. L-3 Commc'ns Corp.*, 658 F.3d 100, 107 (1st Cir. 2011); *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 146 (5th Cir. 2004); *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003)).)

## 2. LOG-NET Was Not Required to Introduce Its Source Code

DHL's primary argument in support of its renewed motion for JMOL is based on the proposition that in a copyright infringement case regarding a software program, the plaintiff is required to provide the fact finder with its source code. According to DHL, the fact finder must have the source code before it because the only way the fact finder can determine whether the two programs are "substantially similar" is by comparing the source code of both programs. Indeed, the out-of-circuit cases DHL relies upon partially support this view of the law. This proposition, however, finds little support in Third Circuit precedent.[7] Moreover, the proposition is inapposite

---

[7] *Granger v. Acme Abstract Co.* does not compel a different view of the law because the plaintiff in *Granger* alleged that he "created the JavaScript functions in the rate calculators, and that the JavaScript functions are his 'original works of authorship' not found in the public domain." *Granger v. Acme Abstract Co.*, 900 F. Supp. 2d 419, 425 (D.N.J. 2012). The Honorable Noel L. Hillman, U.S.D.J., found,

> The jury, cannot undertake the required analysis of [the] plaintiff's title insurance calculators because [the] plaintiff has not provided any description of his original source code and how it is copyrightable under the idea-expression dichotomy. . . . Without those materials, it is also impossible to determine whether [the] plaintiff is seeking to enforce a copyright in the same work that he deposited with the Copyright Office.

*Id.* Here, LOG-NET did not claim that its source code is the protected material that was copied by DHL.

16

in a case, such as this one, where the plaintiff is not asserting that the defendant infringed upon the source code of the protected work.

Here, in Count 4, LOG-NET asserted that:

> DHL has violated LOG-NET's exclusive rights in the LOG-NET® Software by, among other things:
>
> - Failing to make subscription payments while utilizing and deploying unauthorized licenses of the LOG-NET® Software;
> - Continuing use of the LOG-NET® Software while breaching the Subscription Agreement;
> - Distributing unauthorized copies of the LOG-NET® Software to its customers for use; and
> - Providing portions of the LOG-NET® Software *Object Code* to GT Nexus without LOG-NET's permission in an effort to reverse engineer the LOG-NET® Software for its own benefit.

(Am. Answer ¶ 83, ECF No. 112 (emphasis added).) LOG-NET's theory of the infringement claim, as summarized by counsel, was not that DHL copied LOG-NET's source code, but that "DHL committed copyright infringement by dispersing confidential information and by reverse engineering[,] . . . specifically the structure of the database, the reporting, the FCR, allocation logic, and EDI messages." (July 20, 2018 Tr. 1651:6-8.) Given LOG-NET's claim and theories, DHL's argument that LOG-NET's failure to produce its source code is fatal to LOG-NET's infringement claim is essentially DHL arguing that LOG-NET failed to provide sufficient evidence to prove DHL's theory of LOG-NET's case (as opposed to DHL arguing that LOG-NET failed to provide sufficient evidence to prove LOG-NET's theory of its case).[8] DHL's focus on LOG-NET's failure to produce its source code ignores the fact that the jointly submitted and consented to jury instructions did not require the jury to determine whether there was substantial

---

[8] The Court notes that GT Nexus's source code was not subpoenaed by LOG-NET and never produced in this matter. Thus, even if LOG-NET had produced its source code, the jury would not have had the ability to compare LOG-NET's source code to GT Nexus's source code because the latter was not in evidence.

similarity between LOG-NET's source code and ISC+ and GT Nexus's database. Instead, the jury instructions provided,

> In this Case, LOG-NET claims that DHL infringed its copyright in the LOG-NET software by copying parts of the software and arranging to have the copied materials included in software known as ISC+ and in documents which were provided by DHL to GT Nexus, a third party software company with which DHL later did business. . . . To prove copying, LOG-NET must demonstrate that DHL obtained a copy of LOG-NET's work, copied it, and then published a software program or document that is substantially similar to LOG-NET's software program.

(*See* Jury Instrs. ¶ 109.)

### a. Third Circuit Precedent Does Not Require the Introduction of a Computer Program's Source Code

"To establish a claim of copyright infringement, a plaintiff must show: '(1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work.'" *Tanksley v. Daniels*, 902 F.3d 165, 172-73 (3d Cir. 2018), *cert. denied*, No. 18-701, — S. Ct. —, 2019 WL 659816 (Feb. 19, 2019) (quoting *Dun & Bradstreet Software Servs.*, 307 F.3d at 206). Unauthorized copying "comprises two . . . components: actual copying and material appropriation of the copyrighted work." *Id.* "Actual copying focuses on whether the defendant did, in fact, use the copyrighted work in creating his [or her] own. If the defendant truly created his [or her] work independently, then no infringement has occurred, irrespective of similarity." *Id.* at 173. Material appropriation of the work, also referred to as "substantial similarity," must also be proven because "a copyright only protects the holder's particular creative expression, not his [or her] ideas." *Id.* at 174. This limitation of protection to only expression, not ideas, is codified in the Copyright Act, specifically Sections 102(a) and 102(b) of Title 17 of the U.S. Code.

The interplay between Sections 102(a) [9] and 102(b) [10] is referred to as the "idea-expression dichotomy." *Tetris Holding, LLC v. Xio Interactive, Inc.*, 863 F. Supp. 2d 394, 400 (D.N.J. 2012). "The doctrine is simple to state—copyright will not protect an idea, only its expression—but difficult to apply, especially in the context of computer programs." *Id.* Nevertheless, the Third Circuit has "held that elements of computer programs may be protected by copyright law[, including] both the code for the program as well as the graphical elements for programs such as video games." *Id.*

The Third Circuit has advised that "there is no general requirement that most of each of two works be compared before a court can conclude that they are substantially similar." *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1245 (3d Cir. 1986). Indeed, the "substantial similarity inquiry cannot be simply quantified in [certain] instances." *Id.* "Instead, the court must make a qualitative, not quantitative, judgment about the character of the work as a whole and the importance of the substantially similar portions of the work." *Id.*

In *Whelan*, the Third Circuit upheld the district court's finding of substantial similarity between two computer programs for dental laboratory record keeping. [11] *Id.* at 1248. During a

---

[9] Section 102(a) provides, in relevant part,

> Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any *tangible medium of expression*, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include . . . literary works . . . .

17 U.S.C. § 102(a) (emphasis added).

[10] Section 102(b) provides, "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b) (emphasis added).

[11] The Third Circuit's approach in *Whelan* has been criticized by other courts. *See Tetris Holding, LLC*, 863 F. Supp. 2d at 401 (listing cases showing disagreement with *Whelan*). Nevertheless, the

bench trial, the expert witness for the defendant testified that he had examined the source and object code for the plaintiff's programs and the defendant's program and "concluded that 'substantive differences in programming style, in programming structure, in algorithms and data structures, all indicate that the [defendant's program] is not directly derived from either of the [plaintiff's programs].'" *Id.* at 1228. Despite this testimony, the district court found that the defendant's program was "substantially similar to [the plaintiff's program] because its structure and overall organization were substantially similar." *Id.* at 1229. On appeal, the defendant challenged this finding by arguing the district court erred in finding that the defendant's program infringed upon the plaintiff's program. *Id.*

The Third Circuit affirmed the district court's finding of substantial similarity based on evidence other than the source and object code. *Id.* at 1248. The Third Circuit also rejected the bifurcated substantial similarity test applied in other circuits and "adopt[ed] a single substantiality inquiry according to which both law and expert testimony would be admissible." *Id.* at 1233 (citations omitted). The defendant argued,

> [B]ecause the district court did not find any similarity between the 'literal' elements (source and object code) of the programs, but only similarity in their overall structures, its finding of substantial similarity was incorrect, for the copyright covers only the literal elements of computer programs, not their overall structures.

*Id.* This argument was rejected as "it would thus appear that the copyrights of computer programs can be infringed even absent copying of the literal elements of the program." *Id.* at 1234.

The Third Circuit agreed with the district court's statement:

> The 'expression of the idea' in a software computer program is the manner in which the program operates, controls and regulates the computer in receiving, assembling, calculating, retaining, correlating, and producing useful information either on a screen, print-out or by audio communication.

---

*Whelan* approach remains the controlling approach in the Third Circuit. *See, e.g., Tanksley,* 902 F.3d at 175 (stating "the basic inquiry remains whether an ordinary observer would perceive that the defendant has copied protected elements of the plaintiff's work.").

*Id.* at 1239 (quoting *Whelan Assocs. v. Jaslow Lab.*, 609 F. Supp. 1307, 1320 (D.N.J. 1985)). Thus, there was an "inescapable [conclusion] that the detailed structure of the [plaintiff's program] is part of the expression, not the idea, of that program." *Id.* The defendant also argued that even if copyright protections extended to the "'non-literal' elements such as the structure of computer programs, there was not sufficient evidence of substantial similarity to sustain the district court's holding[.]" *Id.* at 1233. The Third Circuit rejected each of the defendant's sub-arguments on this issue and found that certain file structures and screen outputs deserved copyright protection. *Id.* at 1242-45. The Third Circuit also rejected the defendant's argument that an examination of five subroutines contained within each program was insufficient and a comparison of the entirety of both programs was required. *Id.* at 1245-56 (stating "because we are concerned with the overall similarities between the programs, we must ask whether the most significant steps of the program are similar.").

### 3. The Jury had Sufficient Evidence to Determine that DHL Infringed

Despite DHL's contention, Third Circuit copyright law establishes that a review of source code is not always required to establish copyright infringement of a software program. Thus, the only questions that need to be answered to resolve DHL's JMOL motion are: (1) what evidence did LOG-NET introduce to establish that LOG-NET held copyrights in protected materials; and (2) what evidence did LOG-NET introduce to show that these protected materials were (a) actually copied and (b) materially appropriated by DHL?

LOG-NET introduced DTE 330, a listing of relevant copyright registrations, and Mr. Motley testified regarding what those copyright registrations covered. Specifically, DTE 330 identified eight different copyrights LOG-NET held. (*See* DTE 313.) Mr. Motley testified that LOG-NET held copyrights in various reports and those reports were covered by two copyrights.

(July 17, 2018, Tr. 1085:14-1086:4.) Specifically, item 5 identified on DTE 330 "LOG-NET Report Version 1.0" is "the layouts[,]" and item 6 on DTE 330, "LOG-NET Version 6.521.2323" is "the actual application itself and how the reports are generated." (*Id.*) Mr. Motley also testified that the LOG-NET database was protected by a copyright identified as item 1, "Log-Net Database Version 4.461," on DTE 330. (July 17, 2018 Tr. 1098:12-18.) Accordingly, the Court is satisfied that the jury had sufficient evidence to conclude that LOG-NET held a copyright in protected materials. The jury was still required, however, to determine whether these materials were actually copied and materially appropriated by DHL.

The jury had sufficient evidence to determine that LOG-NET's copyrighted materials were actually copied and materially appropriated by DHL. Several witnesses testified regarding the similarities between LOG-NET's database and ISC+. Specifically, Mr. Motley testified that a portion of a DHL document on ISC+ contained table names, field names, and field lengths pulled directly from LOG-NET's database. (July 17, 2018 Tr. 1053:14-1054:17 (testifying regarding DTE 65).) Mr. O'Keefe, similarly, testified about the similarities between the table names, field names, and database schema between ISC+ and LOG-NET's database. (July 18, 2019 Tr. 1226:6-1228:14 (testifying regarding DTE 65).) Given this testimony and documentary evidence, the Court finds that the jury had sufficient evidence to determine, by a preponderance of the evidence, that DHL copied LOG-NET's protected materials and the materials were substantially similar. Moreover, given DHL's misplaced focus on LOG-NET's failure to produce its source code and failure to address evidence LOG-NET did introduce, DHL has not satisfied its burden of showing that the jury's findings were not supported by "substantial evidence."

**C. LOG-NET's Motion for Attorneys' Fees is Denied**

The Copyright Act provides, "[i]n any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party[,] . . . . [and] the court may also award a reasonable attorneys' fee to the prevailing party as part of the costs." 17 U.S.C. § 505. Attorneys' fees are not awarded as a "matter of course," instead, they are "awarded to prevailing parties only as a matter of the court's discretion." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994). The court is required to "make a . . . particularized case-by-case assessment." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1985 (2016). The Supreme Court has identified "several nonexclusive factors for courts to consider, *e.g.*, frivolousness, motivation, objective unreasonableness[,] and the need in particular circumstances to advance considerations of compensation and deterrence[.]" *Id.* (quoting *Fogerty*, 510 U.S. at 534 n.19) (internal quotations marks omitted). The Supreme Court has also instructed that the court "should give substantial weight to the objective reasonableness of the losing party's position" and "retains discretion . . . to make an award even when the losing party advanced a reasonable claim or defense." *Id.* at 1983.

**1. The Parties' Arguments**

LOG-NET argues that it is the prevailing party and all four factors identified by the Supreme Court are satisfied. (Fees Br. 2.) First, LOG-NET argues that DHL's factual defense was frivolous. (*Id.*) LOG-NET argues that the trial testimony of Mr. Motley, Mr. O'Keefe, and Mr. Bertsch establish that "DHL had no good faith defense to the claim that [DHL] had infringed LOG-NET's copyright in its database through its creation of ISC+." (*Id.* at 2-3.) Second, LOG-NET argues that DHL's improper motivation is evidenced by an e-mail message and testimony regarding a meeting with DHL employees discussing "creating an environment to drive LOG-NET into insolvency." (*Id.* at 4.) LOG-NET also avers that DHL's actions in obtaining a

preliminary injunction and DHL's "series of unsuccessful dispositive motions" are evidence of DHL's improper motivation. (*Id.*) Next, LOG-NET argues that DHL's factual position was objectively unreasonable because "DHL presented witnesses who stated that they thought they knew from somewhere they could not identify[,] that someone at DHL had, at sometime in the past, created the ISC+ databased on their own." (*Id.* at 4-5.) LOG-NET also argues that "DTE 65—the ISC+ database schema chart—specifically referenced LOG-NET's tables and the length of columns in the LOG-NET systems[,]" yet, no witness could "provide a rational explanation for this copying[.]" (*Id.* at 5.) Fourth, LOG-NET argues that the compensation factors support an attorneys' fee award because LOG-NET's efforts to litigate the claim were impacted "by the disparity in size between the litigants and their resources[,]" and a "gauntlet of motion practice." (*Id.* at 5-6.)

DHL opposes LOG-NET's motion for attorneys' fees primarily arguing that all four relevant factors are not satisfied.[12] (DHL's Opp'n Br. 1-2 ("Fee Opp'n"), ECF No. 308.) DHL opposes LOG-NET's improper motive argument by stating that "DHL never wanted to drive LOG-NET out of business . . . because DHL's entire book of business was running on the LOG-NET system." (*Id.* at 22.) Thus, if LOG-NET had gone out of business, "DHL would no longer be able to serve its customers." (*Id.*) DHL also argues that "DHL [n]ever embarked on a plan to" drive LOG-NET out of business. (*Id.*) DHL states that it was LOG-NET that delayed the case through discovery related issues and disputes, a summary judgment motion, an application for a preliminary injunction, and a 1,600-item trial exhibit list containing erroneous entries. (*Id.* at 22-23.) DHL argues that the "gauntlet of motion practice" LOG-NET refers to was a motion to

---

[12] Because the Court finds that DHL is not entitled to JMOL, it will not repeat DHL's arguments related to the JMOL.

dismiss that was denied as moot and two motions for partial summary judgment, one of which LOG-NET filed. (*Id.* at 24-25.)

DHL argues that six of LOG-NET's seventeen counterclaims were dismissed prior to trial and that DHL prevailed on fifteen of the seventeen claims is evidence of "what happens when a party files a kitchen sink full of claims that lack objective merit." (*Id.* at 25.) DHL argues that LOG-NET's deterrence argument, discussed in greater detail in the papers related to LOG-NET's motion for a permanent injunction, fails because "LOG-NET introduced no evidence at trial that DHL intends to, would ever or could ever sell ISC+ to others or incorporate it into another system." (*Id.* at 26.) DHL's final argument is essentially that LOG-NET did not act equitably throughout the litigation and cannot rely on the Court's equity powers for an award of attorneys' fees. (*Id.*)

LOG-NET is a "prevailing party" within the meaning of the Copyright Act. "A party is deemed to have prevailed when '[the party] succeed[s] on any significant issue in litigation which achieves some of the benefit [the party] sought in bringing suit.'" *Schiffer Publ'g, Ltd. v. Chronicle Books, LLC*, No. 03-4962, 2005 U.S. Dist. LEXIS 9996, at *7 (E.D. Pa. May 24, 2005) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). The jury found for LOG-NET on Count 4 and found that DHL was liable for copyright infringement. The Court's denial of DHL's motion for JMOL confirms the jury's decision. LOG-NET, accordingly, is a prevailing party.

The Court finds that LOG-NET is not entitled to attorneys' fees because DHL's defense to LOG-NET's claim was not objectively unreasonable. As a threshold matter, the Court finds that the parties' reciprocal allegations of sharp litigation practices are hyperbolic descriptions of the ordinary course of litigation between former business partners whose relationship steadily deteriorated over time. Given the distrust and rancor between the parties, aggressive litigation is to be expected. The parties' allegations regarding their opponent's litigation tactics, accordingly,

do not factor into the Court's analysis. LOG-NET concedes that DHL's legal defense—that DHL did not copy portions of LOG-NET's database into ISC+—is a "clearly valid defense from a legal perspective." (Fees Br. 5.) Thus, the Court must determine whether DHL's defense was factually unreasonable. *Schiffer Publ'g, Ltd.*, 2005 U.S. Dist. LEXIS 9996, at *12 ("Objective unreasonableness encompasses both a legal and a factual component.").

DHL's factual defense was not objectively unreasonable. LOG-NET presented witnesses who testified that portions of the ISC+ database as reflected in DTE 65 were from LOG-NET's database. (Fees Br. 2-3 (describing testimony).) DHL's witnesses testified that they did not have personal knowledge of the origins of ISC+. (*Id.* at 3 (describing testimony).) It is not unreasonable for a witness to testify that he or she does not have personal knowledge on a particular subject. Indeed, the Federal Rules of Evidence preclude a witness from testifying about a subject that the witness does not have personal knowledge of. *See* Fed. R. Evid. 602. LOG-NET's argument attempts to implement an inappropriate burden shift. It was LOG-NET's burden to prove each element of the copyright infringement claim. DHL was under no burden to explain the origins of the ISC+ database. The Court, accordingly, finds LOG-NET's argument to the contrary unpersuasive and further finds that DHL's factual defense was not objectively unreasonable.

The Court finds that several relevant factors do not weigh in favor of an attorneys' fees award. A party is "improperly motivated only if [the party does] not have 'a good faith intent to protect a valid interest, but rather a desire to discourage and financially damage a competitor by forcing it into costly litigation.'" *Schiffer Publ'g, Ltd.*, 2005 U.S. Dist. LEXIS 9996, at *10 (quoting *Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 140 F. Supp. 2d 111, 116 (D. Mass. 2001). LOG-NET's theory that DHL was attempting to drive it into insolvency (Fee Br. 3-4) is counterbalanced by testimony that DHL was reliant on LOG-NET for the continued operation of

its business (Fee Opp'n 9 (citing relevant testimony)). LOG-NET argues that its theory is confirmed by an e-mail message in which DHL employees proposed a meeting to discuss driving LOG-NET into insolvency. LOG-NET, however, never established that this meeting actually occurred in fact. Moreover, even if the meeting did occur, LOG-NET did not establish that DHL took affirmative steps to force LOG-NET into insolvency. DHL's implicit argument that DHL was reliant on LOG-NET to the point where engaging in deleterious behavior towards LOG-NET would have been detrimental to DHL is persuasive. The argument assists in explaining why DHL would pursue litigation against LOG-NET, to protect DHL's legitimate business interests, and prevents the Court from finding that DHL did not have a "good faith intent to protect a valid interest." *Id.* at *10. The Court, accordingly, finds that the motivation factor does not weigh in favor granting attorneys' fees.

LOG-NET's frivolousness arguments are intertwined with its unreasonableness arguments. The Court, accordingly, finds that the frivolousness factor does not weigh in favor granting attorneys' fees.

"Compensation 'helps to ensure that all litigants have equal access to the courts to vindicate their statutory rights. It also prevents copyright infringements from going unchallenged where the commercial value of the infringed work is small and there is no economic incentive to challenge an infringement through expensive litigation.'" *Id.* at *18-19 (quoting *Quinto v. Legal Times of Wash., Inc.*, 511 F. Supp. 579, 581 (D.D.C. 1981)). "[T]he policies served by the Copyright Act[, however,] are more complex, more measured, than simply maximizing the number of meritorious suits for copyright infringement." *Fogerty*, 510 U.S. at 526. "[A] successful defense of a copyright infringement action may further the policies of the Copyright Act every bit as much as a successful prosecution of an infringement claim by the holder of a copyright." *Id.* at 527.

Here, LOG-NET alleges that there was a disparity between the parties because of differences in size and resources. This argument is undermined by the vigorous defense LOG-NET mounted against DHL's claims and LOG-NET's robust prosecution of its counterclaims. The purposes of copyright law—"enriching the general public through access to creative works"—would be served by an award for LOG-NET. *Fogerty*, 510 U.S. at 527. This case, however, is not one in which LOG-NET would not have had an incentive to litigate because of the low commercial value of the infringed work. LOG-NET's damages expert made clear the significant economic incentive LOG-NET had to vindicate its rights. The Court, accordingly, finds that the compensation factor weighs in favor of an award.

In sum, three of the four factors do not weigh in favor of granting attorneys' fees. The one factor that does weigh in favor of an award, the compensation factor, does not weigh so heavily in favor of an award as to be dispositive on this issue. These four factors are, as the *Kirtsaeng* Court advised, non-exhaustive. To the extent the parties' briefs raise other factors, the Court finds them without merit and does not address them. Moreover, the Court cannot identify other factors that would be dispositive in nature. The Court, accordingly, denies LOG-NET's motion for attorneys' fees.

### D.     LOG-NET's Motion for Release of Bond Obligation is Denied

Pursuant to Rule 65(c), "the [C]ourt may issue a preliminary injunction or a [TRO] only if the movant gives security in an amount that the [C]ourt considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." An injunction bond issued under Rule 65(c) "provides a fund to use to compensate incorrectly enjoined defendants." *Sprint Comm. Co. L.P.. v. CAT Comm. Int'l Inc.*, 335 F.3d 235, 240 (3d Cir. 2003) (citation omitted). "A wrongfully enjoined [party] must establish what damages were

proximately caused by the erroneously issued injunction in order to recover and the alleged damages cannot be speculative." *Va. Plastics Co. v. Biostim, Inc.*, 820 F.2d 76, 80 n.6 (3d Cir. 1987) (citation omitted). "[A] party is wrongfully enjoined when it had a right all along to do what it was enjoined from doing." *Latuszewski v. VALIC Fin. Advisors, Inc.*, 393 F. App'x 962, 966 (3d Cir. 2010) (quoting *Glob. NAPS, Inc. v. Verizon New Eng. Inc.*, 489 F.3d 13, 22 (1st Cir. 2007)). The Court, accordingly, must determine whether LOG-NET was wrongfully enjoined.

On July 5, 2012, the Honorable Joel A. Pisano, U.S.D.J., granted DHL an injunction enjoining LOG-NET from:

> (a) denying DHL access to any Software Licenses, as defined in the Parties' 2008 Master License and Subscription Agreement, as amended in February 2011 . . . , and
>
> (b) withholding technical support and services from DHL, for which DHL pre-paid $162,400 in February 2012.

(Order ii, ECF No. 51.) Judge Pisano also ordered DHL to post a $1,000,000 bond. (*Id.*) DHL posted the bond on August 9, 2012. (Injunction Bond, ECF No. 65.)

Pursuant to Rule 65, LOG-NET moved for release of the $1,000,000 bond on the grounds that LOG-NET was "wrongfully enjoined." (Bond Br. 1.) LOG-NET insists that the central issue in DHL's application for the injunction was whether DHL had perpetual licenses under the contract. (*See id.* at 1-2.) LOG-NET argues that the amount of the bond reflected "the price due to LOG-NET" if it were found that "DHL was not permitted to use licenses in perpetuity for external customers without payment." (*Id.* at 3.) LOG-NET asserts that it is a wrongfully enjoined party because "[u]ntil the Court entered the preliminary injunction on DHL's breach of contract claims, LOG-NET had a right to turn off the system if DHL was not going to pay for it." (*Id.* at 5.) "The jury determined[, however,] that DHL did not show it had a perpetual right to the system[,]" and "[t]hus, LOG-NET was wrongfully enjoined." (*Id.*) DHL opposes LOG-NET's

motion and argues that the jury's verdict in its favor on Count 1 of LOG-NET's counterclaims "means that DHL was *not* required to pay subscription fees for post-July 2012 use of the LOG-NET system." (DHL's Opp'n Br. 4, ECF No. 309.)

The jury's verdict that LOG-NET was not liable for Count 1 does not establish that LOG-NET had the right to do what it was enjoined from doing. As a threshold matter, the Court notes that the jury instructions for Count 1 did not directly address whether LOG-NET had the right to deny DHL access to the software. Indeed, a review of the jury instructions for Count 1 shows that while this issue was included in a compound factual allegation with multiple elements the jury had to consider. The jury instruction for Count 1 of DHL's claims stated,

> DHL claims that LOG-NET breached the contract in the following manner: DHL alleges that LOG-NET breached the parties' License Agreement when it shut down DHL's and DHL's customers' access to numerous concurrent user seats as to which DHL had paid the required amount of subscription fees to establish perpetual rights under the Agreement.

(Jury Instrs. ¶ 24.) To resolve this count and find that LOG-NET was not liable for breach of contract, the jury had to make findings of fact regarding the parties' conduct and decide whether LOG-NET's actions breached the agreement. This process did not necessarily require the jury to consider whether LOG-NET had the right to deny DHL access. For example, the jury may have determined that LOG-NET did not shutdown any seats which DHL rightfully had access to. The jury, alternatively, may have concluded that DHL never paid the required amounts to establish perpetual rights in seats that had been canceled by DHL. These factual issues were in dispute at trial. Thus, because the jury could have reached their conclusion on Count 1 without deciding that LOG-NET had the right to deny DHL access to the software, the jury's verdict does not establish that LOG-NET had the right to shutdown DHL's access to the system.

**E.** **LOG-NET's Motion for a Permanent Injunction is Denied Without Prejudice**

The Copyright Act provides that the Court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). The "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*

LOG-NET seeks a permanent injunction under the Copyright Act. (Injunction Br. 3.) LOG-NET argues that all four factors are satisfied and that it is "entitled to the permanent injunction that it requested in its Amended Complaint."[13] (*Id.*) DHL opposes LOG-NET's motion for a permanent injunction arguing that the four factors are not satisfied.[14] (*See* DHL's Opp'n Br. ("Injunction Opp'n"), ECF No. 307.) While addressing the irreparable harm factor, DHL argues that the injunctive relief LOG-NET seeks is overbroad. (*Id.* at 19.) For the reasons stated below, the Court agrees with DHL, but will provide LOG-NET the opportunity to refine its request for relief.

LOG-NET's Amended Answer requests a: "[j]udgment and/or Court Order requiring DHL to (i) destroy all copies and/or derivative copies of LOG-NET business specifications, confidential information and technical specifications regarding the software and (ii) produce certification as to

---

[13] The Court notes that LOG-NET did not file an "Amended Complaint." The Court interprets LOG-NET's reference to an "Amended Complaint" to be a reference to LOG-NET's Amended Answer at docket entry 112.

[14] Because the Court has found that DHL is not entitled to JMOL, the Court does not address the same arguments again.

the destruction by DHL, and any party to whom DHL has distributed the software specification, of all copies and/or derivative copies of all LOG-NET business specifications, confidential information and technical specifications regarding the software." (Am. Answer 40-41.) LOG-NET also requested "[p]reliminary and permanent injunctive relief enjoining DHL and any of its agents, officers or employees from directly or indirectly infringing upon LOG-NET's copyrights and trademarks, misappropriating LOG-NET's trade secrets, unfairly competing against LOG-NET, and misrepresenting the nature, characteristics, and qualities of the LOG-NET® Software to both existing and potential customers of LOG-NET pursuant to 17 U.S.C. § 502, 15 U.S.C. § 1116 and the common law." (*Id.* at 41.)

LOG-NET's moving brief identifies four individual categories of works that LOG-NET states were infringed. (Injunction Br. 1-2 (identifying ISC+; LOG-NET GDX EDI CUSTOMER EDI; multiple servers; and GT Nexus FCR).) The same chart identifying the protected works identifies multiple other parties other than DHL who are "known parties utilizing or distributing the work[.]" (*Id.*)

LOG-NET's request for injunctive relief is overly broad for several reasons. First, the jury instructions on Count 3 included a limited set of factual allegations that LOG-NET alleged DHL did to infringe upon its copyrighted materials. (*See* Jury Instrs. ¶ 109 (stating "LOG-NET claims that DHL infringed its copyright in the LOG-NET software by copying parts of the software and arranging to have the copied materials included in software known as ISC+ and in documents which were provided by DHL to GTNexus[.]").) The language of the injunctive relief sought is broader than the factual allegations LOG-NET raised at trial. Thus, LOG-NET seeks to enjoin activities that the verdict on Count 4 does not encompass. Second, LOG-NET's brief identifies non-parties who are allegedly in control of copyrighted materials. The jury's verdict on Count 4

is inapplicable to non-parties, and therefore it is unclear what power the Court would have to enjoin non-parties. Finally, DTE 65 was a significant portion of LOG-NET's allegations regarding Count 3. DTE 65 includes numerous lines of header names, fields, and relationship schema that are a part of ISC+ and which allegedly constitute LOG-NET's protected material. LOG-NET's reply states that "DHL has a new computer system that, while it relies upon ISC+, the LOG-NET reports" and other items, the new system was "theoretically designed to replace LOG-NET completely." (LOG-NET's Reply Br. 6, ECF No. 320.) Thus, per LOG-NET, "DHL can continue its business without continued use of the infringing ISC+ application." (*Id.*) Given these statements, it is unclear why LOG-NET's request as to ISC+ is not moot, and whether LOG-NET is asking the Court to enjoin DHL's use of the entirety of a program that it no longer uses or only those portions that infringe upon LOG-NET's copyrighted materials. The Court, accordingly, denies LOG-NET's permanent injunction motion without prejudice. The Court grants LOG-NET leave to file supplemental briefing that addresses the issues outlined above and is accompanied by a proposed order that contains specific, appropriately tailored restraints.

### F.    LOG-NET's Motion for Prejudgment Interest is Granted

In diversity cases, such as this case, federal courts must apply state law to award prejudgment interest. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494 (1941); *Jarvis v. Johnson*, 668 F.2d 740, 746 (3d Cir. 1982) (holding that "federal courts in diversity cases should apply state law with respect to prejudgment interest"). "Under New Jersey state law, the purpose of prejudgment interest is to 'compensate the plaintiff for the loss of income that would have been earned on the judgment had it been paid earlier.'" *Thabault v. Chait*, 541 F.3d 512, 533 (3d Cir. 2008) (quoting *Ruff v. Weintraub*, 519 A.2d 1384, 1390 (N.J. 1987)). A prejudgment interest award "on contract and equitable claims is based on equitable principles." *Cty. of Essex v. First*

*Union Nat. Bank*, 891 A.2d 600, 608 (N.J. 2006). Therefore, an award of prejudgment interest may run on contract claims in accordance with equitable principles. *Litton Indus., Inc. v. IMO Indus., Inc.*, 982 A.2d 420, 430 (N.J. 2009); *Cty. of Essex*, 891 A.2d at 608. In awarding prejudgment interest,

> [t]he basic consideration is that the defendant has had the use, and the plaintiff has not, of the amount in question; and the interest factor simply covers the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled.

*Rova Farms Resort, Inc. v. Inv'rs Ins. Co.*, 323 A.2d 495, 512 (N.J. 1974). The purpose of the award is not punitive. *Coffman v. Keene Corp.*, 608 A.2d 416, 424-25 (N.J. Super. Ct. App. Div. 1992). Rather, "[t]he 'equitable purpose of prejudgment interest is to compensate a party for lost earnings on a sum of money to which it was entitled, but which has been retained by another.'" *N. Bergen Rex Transp., Inc. v. Trailer Leasing Co.*, 730 A.2d 843, 851 (N.J. 1999) (quoting *Sulcov v. 2100 Linwood Owners, Inc.*, 696 A.2d 31, 39 (N.J. Super. Ct. App. Div.), *certif. granted*, 702 A.2d 349 (N.J. 1997)).

The decision to "award . . . prejudgment interest in a contract case is within the sound discretion of the trial court." *Litton Indus., Inc.*, 200 N.J. at 390. Similarly, it is within the discretion of the Court to determine "the rate at which prejudgment interest is calculated." *Id.* Finally, in contract cases, the trial court has discretion to determine the date on which prejudgment interest starts to accrue. *See Cty. of Essex*, 891 A.2d at 608-09 (citing *In re Estate of Lash*, 776 A.2d 765, 773-74 (N.J. 2001)).

LOG-NET moved pursuant to New Jersey law for prejudgment interest. (Interest Br. 1.) LOG-NET's sole argument in support of prejudgment interest is that it is an "appropriate" award. (*Id.*) LOG-NET asserts that the interest cost to LOG-NET for borrowing the amount the jury awarded would have been no less than 3.25%, but LOG-NET could not have borrowed "such a

sum on a fixed rate for six years." (*Id.*) Thus, per LOG-NET, the "interest rate should be adjusted to match the prime rate over the course of six years . . . ." (*Id.*)

DHL opposes LOG-NET's motion for prejudgment interest with several arguments.[15] First, DHL argues that this matter is one in which awarding prejudgment interest would be adding to a "windfall damages award." (DHL's Opp'n Br. 4, ECF No. 306 (citing *Thomas v. Duralite Co.*, 524 F.2d 577, 589 (3d Cir. 1975)).) Next, DHL argues that where "a written agreement governs the parties' relationship, the party seeking an award of prejudgment interest must come forward with evidence in the agreement entitling it to such a remedy for breach of the agreement[,]" and no such evidence has been put forward by LOG-NET. (*Id.* (citing *Interpool, Inc. v. Four Horsemen, Inc.*, No. 16-2490, 2017 WL 1284766, at *5 (D.N.J. Mar. 24, 2017); *Interstate Realty Mgmt. Co. v. PF Holdings, LLC*, No. 16-4095, 2017 WL 53707, at *3 (D.N.J. Jan. 4, 2017)).) Finally, DHL argues that the 3.25% interest LOG-NET proposes is excessive because "[a]bsent unusual circumstances, courts in this District use the prejudgment interest rate outlined in New Jersey Court Rule 4:42-11(a)(ii) when determining the rate for prejudgment interest on contract-based claims." (*Id.* at 7 (citing *Amba v. Rupari Food Servs., Inc.*, No. 10-4603, 2016 WL 6471019, at *4 (D.N.J. Oct. 31, 2016)).)

DHL's arguments in opposition to LOG-NET's motion are unpersuasive. Given the Court's determination that the jury had a reasonable basis upon which to reach the verdict and damages award, this not a situation in which the award is a "windfall" for LOG-NET. The proposition that in a breach of contract case the prevailing party must identify a provision in a contract providing for such remedy emanates from an unpublished opinion from this district. The

---

[15] Because the Court finds that DHL is not entitled to a new trial, the Court does not recount or address DHL's arguments regarding a new trial as related to prejudgment interest.

proposition, however, is not supported with a citation in that case. *See Interstate Realty Mgmt. Co.*, 2017 WL 53707, at *3 (stating without citation, "Interest in a contract case derives from the provision for interest in the contract itself, and no such clause providing for pre-judgment interest is in the record. Accordingly, no pre-judgment interest will be awarded."). DHL did not cite, nor could the Court independently locate, New Jersey precedent to support this proposition. This proposition is at odds with the purpose of prejudgment interest and the New Jersey Supreme Court's determination that in exceptional cases an interest rate specified in a contract can be suspended. *See N. Bergen Rex Transp., Inc.*, 730 A.2d at 851 ("[P]rejudgment interest is not a penalty but rather its allowance simply recognizes that until the judgment is entered and paid, the defendant has had the use of money rightfully the plaintiff's."). Finally, the Court agrees with DHL that this case is not an unusual circumstance requiring it to deviate from the norm that "the Court will award prejudgment interest at the rate set forth in New Jersey Court Rule 4:42-11a." *Amba*, 2016 WL 6471019, at *4.

The Court finds that LOG-NET is entitled to prejudgment interest to compensate LOG-NET for benefits DHL prevented LOG-Net from receiving. The basic consideration that supports this finding is the jury's verdict that DHL acted with bad motives or intentions or engaged in deception or evasion in the performance of the contract while depriving LOG-NET of the benefits of the contract. The applicable prejudgment interest, therefore, is "the value of the sum awarded for the prejudgment period during which [DHL] had the benefit of monies to which [LOG-NET] is found to have been earlier entitled." *Rova Farms Resort, Inc.*, 323 A.2d at 512. LOG-NET requests that the prejudgment interest be awarded starting in March 2012 through the date of final judgment. (Interest Br. 2.) Presumably, LOG-NET chose March 2012 because that is when DHL initiated this litigation. Based on the Court's discretion and principles of equity, the

Court finds that March 2012 is an appropriate start date of prejudgment interest recognizing that the filing of the complaint and seeking an injunction in this matter marked a significant shift in the relationship between the parties and may have contributed to the jury's finding for LOG-NET on Count 3. *A.J. Tenwood Assocs. v. Orange Senior Citizens Hous. Co.*, 491 A.2d 1280, 1284 (N.J. Super. Ct. App. Div. 1985) ("Generally, the awarding of prejudgment interest is subject to the discretion of the trial court in accordance with principles of equity.").

III.  **Conclusion**

For the reasons set forth above, the Court denies DHL's omnibus motion, denies LOG-NET's motions for Attorneys' Fees and Costs, Release of Bond Obligation, and Permanent Injunction, and grants LOG-NET's motion for Prejudgment Interest. The Court will issue an Order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

**Dated:** March 31st, 2019